EGW: USAO 2018R00946

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | CASE NO. GLS-19-610 |
| MICHAEL ANDRE BROWN, | * | FILED UNDER SEAL |
| Defendant | * | |

*******

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

Your Affiant, Michael A. Ober, Task Force Officer of the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states as follows:

### Background and Introduction

1. I have been a member of the Prince George's County Police Department ("PGPD") since 1996 and am currently a Sergeant. I was assigned to the PGPD Criminal Investigations Division from 2005 through 2011, the PGPD Internal Affairs Division's Special Investigation Response Team from 2012 through 2015, and, as of 2015, the FBI Public Corruption Unit as a Task Force Officer. I completed a twenty-four week Law Enforcement Officer's Basic Training Course for the Prince George's County Police Academy and have received regular training since that time from the PGPD Advanced Officer's Training Unit. Additionally, I received a Bachelor's Degree in Criminology/Criminal Justice from the University of Maryland, College Park, and have received specialized investigative training from the PGPD, the FBI, and other public agencies and private schools and institutions. I am familiar with federal laws as well as the laws in the State of Maryland, and have been trained in the investigation of violations of those laws.

2. During the course of my work, I have investigated numerous violations of the laws of the State of Maryland, including bribery offenses, homicides, sexual assaults, carjackings, and robberies, in addition to violations of federal laws. Through training, education, and experience, I am familiar with investigations involving corrupt public officials. I have also made numerous arrests for violations of the laws of the State of Maryland, which have led to convictions in the courts of this state. As a law enforcement officer, I have testified under oath, affirmed applications in support of search and arrest warrants, and participated in the interrogation of criminal defendants. Further, I have participated in debriefings of individuals involved in corruption and participated in numerous searches, arrests, and seizure warrants involving a variety of federal offenses.

3. I am an "[i]nvestigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, federal offenses.

4. As part of my duties, I am engaged in the investigation of **MICHAEL ANDRE BROWN** ("**BROWN**"). I am familiar with the facts and circumstances of this investigation. As set forth below, I respectfully submit that there is probable cause to believe that **BROWN** has committed various federal offenses, including: (1) as a public official, otherwise than as provided by law for the proper discharge of official duty, receiving and accepting, and agreeing to receive and accept, anything of value personally for or because of an official act performed or to be performed by him, in violation of 18 U.S.C. § 201(c)(1)(B), on or about December 26, 2018; (2) as a public official, corruptly receiving, accepting, and agreeing to receive and accept, anything of value personally in return for being influenced in the performance of any official act, in violation

of 18 U.S.C. § 201(b)(2)(A), and the lesser included offense of a violation of 18 U.S.C. § 201(c)(1)(B), on or about December 28, 2018; and (3) an additional violation of 18 U.S.C. § 201(b)(2)(A), on or about February 11, 2019 (collectively, the "**TARGET OFFENSES**"). The case is being investigated by the Baltimore Division of the FBI and the PGPD.

5. I have personally participated in the investigation of the **TARGET OFFENSES** and have reviewed reports and had discussions with other law enforcement officers related to the instant investigation. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals.

6. This affidavit is submitted for the limited purpose of establishing probable cause for the requested criminal complaint and arrest warrant and, thus, it does not contain every fact known to me or the United States. Instead, I have set forth only those facts that I believe are necessary to establish probable cause in support of the proposed criminal complaint and arrest warrant. I have not, however, excluded any information known to me that would defeat a determination of probable cause.

## Statement of Probable Cause

7. Based on my involvement in this investigation, I know that **BROWN** is currently an employee of COMPANY-1 in Camp Springs, Maryland. I also know that COMPANY-1 is a federally-contracted business tasked with, among other things, administering urinalysis tests to individuals on federal probation, supervised release, and pre-trial supervision ("Federal Probationers") on behalf of the U.S. Probation and Pretrial Services Office of the District of Maryland. These tests are conducted to ascertain whether or not Federal Probationers are

following the guidelines set forth as conditions of their federal supervision. **BROWN** is a urinalysis technician for COMPANY-1, whose responsibilities include conducting, and who regularly conducts, urinalysis testing for Federal Probationers pursuant to that federal contract.[1]

8. Instant urine drug tests, also known as a Urine Drug Screen ("UDS") or Urine Analysis/Urinalysis ("UA"), are administered by using a urine drug test cup that can deliver rapid results within minutes of receiving a urine sample. The UDS/UA analyzes urine for the presence of certain illegal drugs and prescription medications, and usually screens drugs that include, but are not limited to, Marijuana, Cocaine, Amphetamines, Barbituates, Ecstacy/MDMA, Opiates, and Oxycodone.

9. During the course of this investigation, I learned that Federal Probationers who are mandated to be screened for drug use as part of their supervision are assigned a "color" during their initial registration process with whatever facility they are assigned. Federal Probationers are instructed to call a phone number daily. Upon calling that phone number, Federal Probationers listen to an announcement for the following day's "color" code or codes. The color codes change daily and are not known to the Federal Probationers. When a Federal Probationer's color is called, the Federal Probationer has to report for a UA.

10. On December 26, 2018, an FBI undercover task force officer ("UC1") met **BROWN** at COMPANY-1 in Camp Springs, Maryland. UC1 was posing as a Federal Probationer

---

[1] Pursuant to 18 U.S.C. § 201, the term "public official" includes "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof . . ., in any official function, under or by authority of any such department, agency, or branch of Government," and the term "official act" "means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. §§ 201(a)(1), (a)(3).

who had been ordered to submit to UA tests as a condition of his/her probation. The meeting was covertly recorded with audio and video equipment.

11. In the lead-up to the UA, UC1 indicated to **BROWN** that UC1 might have a positive urinalysis result, by saying, "I can't get off the boom [slang for marijuana], the weed [slang for marijuana]."[2] **BROWN** replied, "Well-well you hot, man?" UC1 stated, "I might be." **BROWN** then stated, "I'll work with you, man."

12. **BROWN** subsequently took UC1 to a bathroom where **BROWN** gave UC1 an instant drug test cup in which to urinate. UC1 urinated into the cup and surreptitiously added a substance to the urine sample that would produce a positive result for Tetrahydrocannabinol ("THC"), which is indicative of the use of Marijuana. After UC1 provided the UA cup to **BROWN**, **BROWN** inspected the cup and indicated to UC1 that it was positive for drug use. UC1 acted troubled at this information.

13. **BROWN** then stated to UC1, "I got you, man (slight laugh). I'll take care of you." UC1, who had been provided operational funds in cash in order to enable a controlled payment to **BROWN**, stated his/her appreciation and placed five $20 bills (totaling $100) on the bathroom sink. UC1 said to **BROWN**, "All right, good lookin' out, man. Take that. What do I do? Just . . . do that?" **BROWN** took the money. **BROWN** then gave instructions to UC1 on how to call in to the recorded announcement for the color of the day. **BROWN**, however, also informed UC1 that his/her color would be called for Friday (December 28, 2018, two days away) and that **BROWN** would be at COMPANY-1 again on that date.

---

[2]   Recording transcriptions herein are in draft form.

14. On December 28, 2018, UC1 again came to COMPANY-1 and again met with **BROWN**. This meeting also was covertly recorded with audio and video equipment. Before submitting to the UA test, UC1 made conversation with **BROWN** in which he/she confirmed that he/she had produced a positive, or "dirty," UA result two days before, and **BROWN** confirmed that **BROWN** had nonetheless reported the UA result as negative, or "clean." **BROWN** also confirmed that the amount that UC1 had given him on December 26, 2018, was $100. Soon thereafter, **BROWN** again took UC1 into the bathroom for a UA test. UC1 again urinated into the instant test cup that **BROWN** provided, and again surreptitiously added the substance to the urine sample that would produce a positive result for THC and, therefore, for the use of Marijuana. UC1 attempted then to give the cup to **BROWN**. **BROWN**, however, told UC1 to "Go ahead and pour it [the urine] out," telling UC1: "'Cause if it was dirty the other day, it's gonna be dirty today." UC1 replied by stating his/her appreciation and asking if **BROWN** "need[ed] anything." **BROWN** replied, "Now I'll take it now if you got some, I mean (laughs)." UC1 asked **BROWN** to throw him/her a number, and **BROWN** replied, "Whatever you got, man. I'm saying I'm flexible. I'm flexible," and then "Uh we can keep it a buck [slang for $100] all the time, man." UC1 then provided **BROWN** with $100 in cash in operational funds, advising that it was "a buck," and stated again his/her appreciation, to which **BROWN** replied, "That's alright. I'll look out for you, man."

15. **BROWN** and COMPANY-1 never contacted the U.S. Probation and Pretrial Services Office to alert them that UC1 had tested positive for drug use.

16.     On February 11, 2019, UC1 again met with **BROWN** at COMPANY-1 in Camp Springs, Maryland, posing as the same Federal Probationer reporting to COMPANY-1 for a drug test. This meeting again was again covertly recorded with audio and video equipment.

17.     During this meeting, while in **BROWN**'s office and after filling out paperwork, UC1 said to **BROWN** in a low voice, "Hey, do I have to-I have to take that"?, referring to the UA test, and added, "Can't I just pay you"? **BROWN** replied to UC1, "Well, you got to go in there," meaning the restroom where the urine samples were collected for testing. After **BROWN** and UC1 walked to the restroom, UC1 resumed the conversation, saying "I can just give you the money? I'll give you one-fifty. I don't give a fuck." **BROWN** then responded in the affirmative. UC1 counted out $150 in U.S. currency in operational funds and gave it to **BROWN** and said, "That should be one-fifty. Good lookin' out." **BROWN** did not have UC1 complete any form of UA.

18.     **BROWN** told UC1 he/she would have to come back "next week" and that UC1 could leave. UC1 then left COMPANY-1. On February 15, 2019, a representative of the U.S. Probation and Pretrial Services Office contacted COMPANY-1 and was informed by a representative of COMPANY-1 that UC1 had tested negative for drugs on February 11, 2019.

## Conclusion

19. Based on the facts outlined above, I respectfully submit that there is probable cause to believe that **BROWN** committed the **TARGET OFFENSES**. Accordingly, I request that the Court authorize a criminal complaint and arrest warrant for **BROWN**.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Michael A. Ober
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn before on March ____, 2019.

_____
HONORABLE GINA L. SIMMS
UNITED STATES MAGISTRATE JUDGE