## ATTACHMENT A

## STIPULATION OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Company 1 was a Maryland company that provided drug and alcohol treatment and testing services in Camp Springs, Maryland. Through a contract, Company 1 was obligated, among other things, to administer urinalysis tests to individuals on federal probation, supervised release, and pre-trial supervision on behalf of the U.S. Probation and Pretrial Services Office of the District of Maryland ("U.S. Probation"). That urine testing was designed to detect the use of controlled substances. In conducting urine testing for individuals on behalf of U.S. Probation, Company 1 urine technicians were responsible for retrieving the urine testing container, escorting the supervisee to the bathroom, observing the supervisee urinating into the container, and retrieving the container. The urine technician was required to record and report, among other information, the date and time of the urine test, whether the individual completed the test, and the result, as well as to notify U.S. Probation if the individual did not appear for a test or did not appropriately provide a urine sample. If the urine testing container indicated a positive result for a controlled substance, Company 1 urine technicians were required to secure and send the urine sample to a laboratory for testing confirmation. The federal contract required Company 1 to report both positive and negative results to U.S. Probation, which relied upon the results to inform the United States District Court regarding whether supervisees were abiding by release conditions.

Defendant **MICHAEL ANDRE BROWN ("BROWN")** was a resident of Maryland and worked at Company 1 as an Office Administrator/Urine Technician. **BROWN** was specifically tasked with operating under Company 1's federal contract and was a public official as defined in 18 U.S.C. § 201(a)(1). From at least in or about December 2018 through in or about February 2019, in his official capacity, **BROWN** accepted cash payments in exchange for falsely reporting urinalysis results as negative for controlled substances when the results were in fact positive.

Individual 1 was a Federal Bureau of Investigation undercover task force officer, who met with **BROWN** on December 26, 2018; December 28, 2018; and February 11, 2019. In the lead-up to a urine test on December 26, 2018, Individual 1 indicated to **BROWN** that Individual 1 might have a positive urinalysis result, saying, "I can't get off the boom [slang for marijuana], the weed." **BROWN** replied, "Well-well you hot, man?" Individual 1 stated, "I might be." **BROWN** then stated, "I'll work with you, man."

**BROWN** subsequently took Individual 1 to a bathroom where **BROWN** gave Individual 1 an instant drug test cup in which to urinate. Individual 1 urinated into the cup and surreptitiously added a substance to the urine sample that would produce a positive result for Tetrahydrocannabinol ("THC"), which is indicative of the use of marijuana. After Individual 1 provided the test cup to **BROWN**, **BROWN** inspected the cup and indicated to Individual 1 that it was positive for drug use. Individual 1 acted troubled at this information. **BROWN** then stated

9

to Individual 1, "I got you, man [slight laugh]. I'll take care of you." Individual 1, who had been provided operational funds in cash in order to enable a controlled payment to **BROWN**, stated his/her appreciation and placed $100 on the bathroom sink. Individual 1 said to **BROWN**, "All right, good lookin' out, man. Take that. What do I do? Just . . . do that?" **BROWN** took the money. **BROWN** then instructed Individual 1 on how to call in to Company 1's recorded announcement for the "color" of particular days, which indicated which supervisees had to report for urine tests. Pursuant to Company 1's contract and the requirements of U.S. Probation, supervisees are not to be informed of when their next test will be. **BROWN**, however, informed Individual 1 that his/her color would be called for Friday (December 28, 2018, two days away) and that **BROWN** would be at Company 1 again on that date.

On December 28, 2018, Individual 1 again came to Company 1 and met with **BROWN**. Before Individual 1 submitted to the urine test, **BROWN** confirmed that Individual 1 had produced a positive, or "dirty," urine test result two days before, and that **BROWN** nonetheless had reported the urine result as negative, or "clean," after Individual 1 had provided **BROWN** with the $100. Soon thereafter, **BROWN** again took Individual 1 into the bathroom for a urine test. Individual 1 urinated into the instant test cup that **BROWN** provided, and again surreptitiously added the substance to the urine sample that would produce a positive result for THC. Individual 1 attempted then to give the cup to **BROWN**. **BROWN**, however, told Individual 1 to "Go ahead and pour it [the urine] out," telling Individual 1, "'Cause if it was dirty the other day, it's gonna be dirty today." Individual 1 replied by stating his/her appreciation and asking if **BROWN** "need[ed] anything." **BROWN** replied, "Now I'll take it now if you got some, I mean [laughs]." Individual 1 asked **BROWN** to throw him/her a number, and **BROWN** replied, "Whatever you got, man. I'm saying I'm flexible. I'm flexible," and then "Uh we can keep it a buck [slang for $100] all the time, man." Individual 1 then provided **BROWN** with $100 in cash, advising that it was "a buck," and stated again his/her appreciation, to which **BROWN** replied, "That's alright. I'll look out for you, man."

With respect to both December 26, 2018, and December 28, 2018, based on **BROWN**'s information, Company 1 reported to U.S. Probation that Individual 1 had submitted a urine test that was negative for controlled substances, when to the contrary, Individual 1 had submitted positive urine test results.

Furthermore, on February 11, 2019, **BROWN** corruptly received, accepted, and agreed to accept $150 in return for using his official position to conceal from U.S. Probation the fact that Individual 1 did not provide a urine sample for testing, as required on that date. While in **BROWN**'s office at Company 1, Individual 1 said to **BROWN**, in reference to the urine test, "Hey, do I have to-I have to take that?" and added, "Can't I just pay you?" **BROWN** replied to Individual 1, "Well, you got to go in there," meaning the restroom where the urine samples were collected for testing. After **BROWN** and Individual 1 walked to the restroom, Individual 1 resumed the conversation, asking if he could "just give you the money? I'll give you one-fifty." **BROWN** responded in the affirmative, and accepted $150 in cash from Individual 1 in exchange for allowing Individual 1 to leave without providing a urine sample. **BROWN** then falsely reported to Company 1 that Individual 1 had submitted a urine test that was negative for controlled substances. In turn, based on **BROWN**'s information, Company 1 reported the false information to U.S. Probation.

10

SO STIPULATED:

_____
Elizabeth G. Wright
Assistant United States Attorney

_____
Michael Andre Brown
Defendant

_____
Charles Burnham, Esq.
Counsel for Defendant

11